IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

DAVID CHERRY, Personal )
Representative of the ESTATE )
OF PAMELA CHERRY, DECEASED, )
    )
    Plaintiff, )
    )
    ) Case No.
vs. ) 2:12-cv-00043
    )
MACON COUNTY HOSPITAL, INC. )
d/b/a MACON COUNTY GENERAL )
HOSPITAL and HANNA C. ILIA, )
M.D., )
    )
    Defendants. )

The videotaped deposition of
RICHARD M. SOBEL, M.D.
September 25 and 30, 2013
VOLUME OF I of III

LAUREL L. EILER, RDR-FAPR, LCR, CCR
Accurate Court Reporting
The Pilcher Building
144 Second Avenue North, Suite 230
Nashville, TN 37201
(615) 244-DEPO or 244-3376
www.ACR-Nashville.com

---

Page 2

**I N D E X**

| | PAGE |
|---|---|
| Examination by Mr. Jameson | 6 |
| Continued Examination by Mr. Jameson | 181 |
| Continued Examination by Mr. Jameson | 336 |
| Examination by Ms. Brown | 396 |
| Further Examination by Mr. Jameson | 493 |

**E X H I B I T S**

| NUMBER | | PAGE |
|---|---|---|
| 70 | Compilation of Four Articles | 14 |
| 71 | Dr. Sobel's Curriculum Vitae | 15 |
| 72 | Richard M. Sobel, MD, MPH, Expert Testimony List, September 2013 | 37 |
| 73 | 4/11/13 Statement of Dr. Sobel's Fees | 51 |
| 74 | Dr. Sobel's Invoices for Services to Date | 61 |
| 75 | Excerpts from Dr. Sobel's 10/13/04 Deposition in Jones v Shelby County Health Care | 65 |
| 76 | Notice of Deposition of Dr. Sobel | 66 |
| 77 | Plaintiff's Time Line with Highlighting and Attached Table of Contents | 69 |
| 78 | Correspondence Received by Dr. Sobel as Outlined in Testimony | 73 |

EXHIBITS CONTINUED ON PAGE #

---

Page 3

**E X H I B I T S**
(CONTINUED)

| NUMBER | | PAGE |
|---|---|---|
| 79 | Literature/Articles Reviewed by Dr. Sobel | 82 |
| 80 | Sample Emergency Physician Record Chest Pain | 170 |
| 81 | 2/12/04 Progress Notes, Bates Stamp FMS59 | 184 |
| 82 | 5/30/11 Macon County General Hospital EKG with Dr. Sobel's Markings | 290 |
| 83 | 05/15/10 EKG with Dr. Sobel's Markings | 300 |
| 84 | 05/16/10 9:53 EKG with Dr. Sobel's Markings | 304 |
| 85 | 05/16/10 2:07 EKG with Dr. Sobel's Markings | 304 |
| 86 | Six Pages of Medical Records with Discharge Instructions | 360 |
| 87 | Compilation of Articles From Dr. Sobel's Testimony in Loyd Case | 383 |
| 88 | Copy of Dr. Sobel's Report | 496 |

---

Page 4

The videotaped deposition of RICHARD M. SOBEL, M.D., taken pursuant to notice for all purposes, at the Wingate Inn, 7882 Senoia Road, Fairburn, Georgia, September 25, 2013, at 9:51 a.m., at the instance of the Defendants, pursuant to the Federal Rules of Civil Procedure.

All formalities as to caption, notice, statement of appearance, et cetera, are waived. Reading and signing of the deposition transcript by the deponent is not waived. All objections except as to the form of the question are reserved for the hearing.

**A P P E A R A N C E S**

For the Plaintiff:

    D. Bruce Kehoe, Esquire
    Wilson, Kehoe, Winingham, LLC
    2859 Meridian Street
    Indianapolis, IN 46208

For Defendant Ilia:

    Michael F. Jameson, Esquire
    Brent A. Kinney, Esquire
    North, Pursell & Ramos
    1850 Bank of America Plaza
    414 Union Street
    Nashville, TN 37219

APPEARANCES CONTINUED ON PAGE 5

EXHIBIT C

Page 276

1 doesn't answer the question, so I have to repeat it,
2 which is why we're here so late, Dr. Sobel.
3  A. I don't think so.
4  Q. So let me repeat the question.
5  Is it your opinion in this case that the EKG
6 machine used on May 30th, 2011, was an old EKG machine?
7  A. Now, Counselor, you just repeated the very
8 same question you just asked me a minute ago, and you've
9 charged me with keeping us late. Now, that makes no
10 apparent sense when --
11  Q. What's your answer?
12  A. I already said no.
13  Q. You said, "I wouldn't be surprised."
14  A. And then you asked me that very same question,
15 and I said no.
16  Q. Okay. So it's not your opinion that it was
17 old?
18  A. I wouldn't be surprised, but not a degree of
19 medical certainty.
20  You asked me two questions. Was it my opinion
21 to a reasonable degree of medical certainty. I told you
22 no.
23  Q. You told me you wouldn't be surprised.
24  A. No. You asked me the question after I said I
25 wouldn't be surprised. I told you no.

Page 277

1  Q. All right.
2  A. You asked me the question again, and I said I
3 wouldn't be -- I said no. No, it isn't my opinion to a
4 reasonable degree of medical certainty. I don't have
5 the date of the machine. How could I say?
6  I wouldn't be surprised. I've worked at these
7 hospitals. They don't tend to have the most up-to-date
8 equipment.
9  Q. But that statement suggests to me that you're
10 suggesting that this was not an up-to-date piece of
11 equipment. Is that your testimony in this case?
12  A. I don't know.
13  Q. Great. Did this EKG computer have sensitive
14 algorithms to detect ST depressions, or do you know?
15  A. I don't know what you mean by "sensitive."
16  Q. Did it have an algorithm to detect ST
17 depressions of any degree?
18  A. No, not of any degree. I don't think so. No.
19  Q. Okay. What is your basis for that testimony?
20  A. Well, it missed it.
21  Q. Okay.
22  A. There are ST depressions that are quite clear
23 that are near a millimeter, so you would presume that
24 the machine was set at greater than a millimeter. Now,
25 how much greater than a millimeter or equal to a

Page 278

1 millimeter or whether the machine was unable to read
2 them because of motion or various other factors, I don't
3 know.
4  Q. And who sets the algorithms?
5  A. Who loads the algorithms?
6  Q. Yeah.
7  A. The manufacturer.
8  Q. So when those showed up at Macon County
9 General Hospital, their technicians don't open up the
10 EKG machine and adjust or tweak the algorithm settings?
11  A. That is correct.
12  Q. All right. Do you know if this EKG computer
13 algorithm had ST depression within its reporting
14 vocabulary?
15  A. I'm sure it did, within reasonable medical
16 certainty if that's helpful.
17  Q. What are you normally looking for to detect a
18 lack of good blood flow to the heart on an EKG?
19  A. A lack of good blood flow to the heart. Wow.
20 That's not a term of art we use.
21  Q. And I took that question --
22  A. A lack of good --
23  Q. -- just so you know, from a question that
24 Dr. Ilia was asked in his deposition.
25  A. Well, a lack of good blood flow to the heart

Page 279

1 would generally indicate a shock state. That's
2 generally not specifically diagnosed
3 electrocardiographically, but it can be. I think you're
4 looking at -- for a different question.
5  Q. I'm repeating a question that was asked by
6 plaintiff's counsel to Dr. Ilia.
7  A. I don't know what the question means, a lack
8 of good blood flow. You'd have to ask me a -- I could
9 try to answer the question as I did already, or I can
10 speculate as to what Mr. Kehoe was thinking.
11  Q. All right. So how would you answer the
12 question if you were going to try to answer the
13 question?
14  A. Well, again, a lack of good blood flow to the
15 heart would mean a shock state, so you would typically
16 not diagnose that on an EKG per se.
17  But I believe he was probably asking about
18 electrocardiographic signs of ischemia, and that is
19 broken down into findings that are diagnostic of a
20 STEMI, findings that are diagnostic of ischemia,
21 findings that are consistent with ischemia, findings
22 that are nonspecific, and then a normal EKG. So the EKG
23 is stratified into those groups, generally speaking.
24 There may be some overlap between non -- between
25 nonspecific and consistent with ischemia, and you may

## Page 467

```
1   A.   They failed.
2   Q.   And is that what we talked about, Number 7
3 above?
4   A.   Correct.
5   Q.   Have we covered that, all of your opinions
6 with regard to that area?
7   A.   Yes.
8   Q.   Would you agree that in medicine there are
9 legitimate differences of opinion about the standard of
10 care?
11  A.   In general, the standard of care is a
12 consensus, so not routinely so.  I mean, you --
13 certainly in a tort situation you find experts that have
14 diametrically opposed opinions.  But in my opinion, the
15 defense experts in this case can be easily refuted.
16  Q.   Well, in general, are you telling me that
17 there are -- there are no legitimate differences of
18 opinion about the standard of care in a case?
19  A.   Not routinely.  The standard of care is
20 generally a consensus --
21  Q.   Okay.
22  A.   -- based on literature, based on experience,
23 based on local factors, so -- but whether or not experts
24 disagree, that's a different question.
25  Q.   Isn't it true that there may be more than one
```

## Page 468

```
1 acceptable way to treat a patient medically?
2   A.   Oh, sure.  That's a different situation and a
3 different question.
4   Q.   And would you agree with me that nurses and
5 hospital personnel have to use their own medical
6 judgment in determining the appropriate care for a
7 patient?
8   A.   Of course they use medical judgment.  It's one
9 of the variables.  Obviously, it's just one of the
10 factors.
11  Q.   Do you have an opinion as to whether the
12 triage portion of her care was properly done?
13  A.   Yes.
14  Q.   Okay.  And what's your opinion?
15  A.   She obviously should have been put on a chest
16 pain pathway, and her acuity level was a two rather than
17 a three.
18  Q.   You testified the other day about the EKG
19 program, and you're not offering any opinions with
20 regard to the EKG -- EKG program --
21  A.   Any new opinions?
22  Q.   -- are you?
23       Well, as to whether it was adequate or
24 inadequate?
25  A.   I want to say that we discussed that in detail
```

## Page 469

```
1 already.  But we could review it if you like, but don't
2 blame me for being -- prolonging the deposition.
3   Q.   Do you have an opinion with regard to the EKG
4 program?
5   A.   All of the ones I've previously given.
6   Q.   That it was inadequate?
7   A.   Well, yes.  It was inadequate to diagnose the
8 electrocardiographic repolarization abnormalities that
9 were consistent with ischemia, yes.
10       MR. KEHOE:  You know she's taking up all your
11 time.  We're going into all of these new opinions now.
12 Is that -- is that what we're doing?
13  Q.   (By Ms. Brown)  Did you review Dr. Jones's
14 report?
15  A.   I did.
16  Q.   Okay.  Do you disagree with any of his
17 opinions with respect to the hospital and the nursing
18 staff?
19  A.   His report gave me a lot of pause.  I would
20 have to pull it out to get more specific.  I could say
21 by and large I almost uniformly agreed with each and
22 every one of his conclusions except perhaps --
23  Q.   You agreed?
24  A.   Disagreed with his conclusions except perhaps
25 some of the things that he mentioned with respect to the
```

## Page 470

```
1 prehospital care.
2   Q.   Well, would you mind pulling out Dr. Jones's
3 report and tell me what you agree with?  Would that be
4 quicker?
5   A.   I don't know.  It's probably not going to be
6 quick either way.  Okay.  It's a fairly lengthy report.
7        Okay.  Well, to try to answer your question,
8 I'd probably start from the back because I think that's
9 where he talked about the prehospital care.
10       THE WITNESS:  I think we lost the air
11 conditioning for a while again.  Okay.  The lights will
12 be going out soon.
13  A.   All right.  "There is conflicting testimony
14 between the family members and documentation by the fire
15 department," et cetera.  "Family members state that they
16 administered resuscitative measures.  The EMT crew
17 provided no resuscitative measures or that they did so
18 inadequately and failed to document accurately."
19  Q.   (By Ms. Brown)  Which page are you on?
20  A.   I -- this is nine.
21       That is a fair, factual summary of the
22 conflicting testimony and the issue regarding the
23 failure of the EMT crew to apparently provide
24 resuscitative measures on a timely basis.  I do agree
25 with that.
```

Page 483

1 contained excerpts."
2   THE COURT REPORTER: I'm sorry?
3   THE WITNESS: I'm sorry. I'm trying to go
4 fast.
5   "ER charts customarily and appropriately
6 contain excerpts from heart monitor strips." I agree.
7 "Rather than the entirety of the strip." I agree.
8 "Primarily because of record volume concerns." I agree.
9   "Heart monitor machines are generally
10 calibrated to print out any significant detected
11 abnormality." I agree.
12   (As read:) "The excerpts appearing in
13 Mrs. Cherry's chart are typical and depict no rhythm
14 abnormalities." Wow. Either he's looking at somebody
15 else's record, or he's got heart rhythm strips that
16 nobody else has. That's hard to fathom there. I don't
17 know what he's looking at. He says there are excerpts.
18 There are no excerpts. Correct me if I'm wrong.
19   Okay. (As read:) "I disagree with any
20 complaint that computerized reading of the EKG as
21 'abnormal' was conclusive, diagnostic, or indicative of
22 an acute coronary syndrome." Some of these things I
23 actually agree with. This is an EKG which is consistent
24 with ischemia, which is of concern for ischemia, but is
25 not frankly diagnostic of ischemia. In other words,

Page 484

1 there are -- to me, it's a 1-millimeter deflection of
2 the ST which raises a lot of concerns. It's not .5, but
3 then again, it's not 6 millimeters. This is not an EKG
4 that is frankly and absolutely diagnostic of ischemia,
5 but this is an EKG that certainly raises concern and may
6 be consistent with ischemia. I think he's missing the
7 point.
8   Let's see. It certainly was abnormal. There
9 was no question of that. So I disagree.
10   (As read:) "Computerized EKGs are subject to a
11 proprietary algorithm." I agree were that.
12   "The GE Mac 1200," I don't have any reason to
13 disagree with that. I don't know what year it was.
14   "EKG's automated interpretation is typically
15 dependent on the manufacturer's choice of algorithm."
16 That's part of it. Also motion is another part of it,
17 also voltage is another part of it, and she had
18 relatively low voltage.
19   (As read:) "The automated interpretation does
20 not represent the recognized standard of acceptable
21 practice." I agree that the -- simply the fact that the
22 machine has detected an abnormality doesn't mean it's
23 absolutely correct. The physician needs to review that
24 and read the EKG appropriately. Sometimes the machine
25 is right. Sometimes it's wrong. Sometimes it sees

Page 485

1 things that the doctor doesn't see and vice versa.
2   Okay. (As read:) "Computer EKG makes no
3 reference to any ST depressions." That is true. I
4 agree.
5   (As read:) "It is not within the acceptable
6 professional standard of care for ER physicians to
7 accept automated interpretations as definitive or
8 accurate." It depends what part of the automated
9 interpretations. eAccess is very good [phonetic].
10 It's better than a human. The voltage measurements, the
11 interval measurements typically are very good, and
12 they're typically better than the human eye. But when
13 it comes to -- unless you use a magnifying glass,
14 perhaps. But when it comes to repolarization
15 abnormalities, EKG computer algorithms are not
16 necessarily accurate. I do agree with that.
17   Q. In the paragraph above that --
18   THE WITNESS: Any chance of turning the air
19 conditioner back on?
20   Q. (By Ms. Brown) The paragraph above that,
21 we've talked about the role of the nursing staff in --
22   THE WITNESS: Thank you.
23   Q. (By Ms. Brown) -- in interpreting the EKGs.
24   And do you want to look through this real
25 quickly, Doctor, and tell me if there's anything else

Page 486

1 that you agree with? That might be a little bit
2 quicker.
3   A. I don't know how else to do it except read it
4 as fast as I can and tell you. That's what I've been
5 doing. I don't know how else to do it. If you have
6 another way, let me know.
7   Q. Well, if you read it and tell us when you find
8 a statement that you agree with?
9   A. Oh, okay. You want me to just do it silently
10 the way I -- instead of reading it out loud?
11   Q. Yeah. That might go a little bit faster.
12   A. All right. I doubt it, but okay.
13   (As read:) "A completely normal EKG would be
14 the exception to the rule for most 58-year-old
15 patients." I don't terribly disagree with that. I'm
16 not quite sure what he means by "exception rather than
17 the rule," but yes, 58 years old, you -- and other ages
18 you may see one abnormality or another. I don't
19 disagree with that.
20   "There are no acute findings," well -- I'm
21 reading to myself.
22   Serial EKGs were required.
23   "I disagree with the contention that an EKG
24 can rule out ischemia." I agree with that.
25   "An EKG can only rule in ischemia, but not