From the Desk of
**Alan E. Jones, MD, FACEP**
**Jackson, MS**

Michael F. Jameson
Attorney At Law
NORTH, PURSELL & RAMOS, PLC
414 Union Street, Suite 1850
Nashville, Tennessee 37219-1783

Dear Mr. Jameson,

  Pamela Cherry presented to the Macon County General Hospital emergency room on May 30, 2011 initially complaining of pain in her jaw and her chest. A nursing assessment noted pain from her neck and jaws down to mid-chest. She was also noted to have back pain. She was repeatedly described as having sunburn.

  Dr. Ilia undertook a complete history of the patient. The record notes that the patient provided her own medical history. Patients have a responsibility to disclose complete and accurate medical information. It is unclear why MCGH medical records from the following day (May 31, 2011) depict a prior medical history of COPD, hypertension, and pulmonary hypertension when these conditions were not disclosed on May 30, 2011. Each of these conditions would have potentially been significant in the emergency room assessment of Mrs. Cherry and, if true, should have been disclosed to Dr. Ilia and nurse Eller Sircy.

  Dr. Ilia circled only hyperlipidemia on the Emergency Physician Record, but this was not in disregard of the other past medical history documented by the nurse. The only past medical history charted by the nurse that wasn't charted again by Dr. Ilia was a history of Crohn's disease, colitis, and hypothyroidism. The nurses' notes were made available for Dr. Ilia's review and consideration in his evaluation and treatment of Mrs. Cherry, and he specifically notes that he reviewed the nursing assessment on the record marked "MCGH0005." The recognized standard of acceptable professional

1

practice did not require Dr. Ilia to again chart that the patient had a history of Crohn's disease, colitis, and hypothyroidism.

The medical history provided by the patient included cardiac risk factors of smoking and hyperlipidemia. When a patient further discloses use of lipid-altering agents, a reported prior history of hyperlipidemia does not necessarily translate to an increased risk for coronary artery disease. Patients who take lipid-altering agents as prescribed have a reduced risk of suffering cardiac events; and those who do have a cardiac event have a reduced risk of death. When a patient informs a medical provider that she is taking a prescription, the medical provider can assume that the patient is taking the prescription as instructed. The physician does not have a duty to ask the patient if they are being truthful in their representation. Medical records from January 22, 2009 at IUHP-Family Medicine-South show Mrs. Cherry's total cholesterol of 169 (which is desirable), LDL of 111 (which is desirable), and HDL of 37 (which is slightly low). During this same period, records from CVS Pharmacy (marked "CVS 00004") indicate that Mrs. Cherry was taking Simvastatin regularly in 2009. In other words, when she was taking it as prescribed, her medication appeared effective in preventing severe elevations of LDL which would otherwise markedly increase her risk of acute cardiac events. Moreover, these records indicate that Mrs. Cherry's biggest risk factor was not hyperlipidemia, but low HDL. HDL of less than fifty (50) in females is low and is considered a risk factor for heart disease.

I disagree with claims that this patient had a "highly significant family history of a first degree relative with coronary artery disease." Mrs. Cherry had absolutely no family history of coronary artery disease. A family history of coronary artery disease includes instances of close family members experiencing precocious or early onset CAD. Such early onset in a close relative indicates a familial component to the development of CAD. There is

no such evidence here. Mrs. Cherry's sister (Janice Ham) stated that their mother had a heart valve replacement, not CAD, and that she underwent the procedure at age 79. Ms. Ham also stated that their mother never had any heart-related medical diagnoses prior to the valve replacement. Mrs. Cherry's husband (David Cherry) described the procedure as "open heart surgery" and stated that it occurred when she was 75 years old. He added that neither of Mrs. Cherry's parents had prior cardiac problems. There was no family history of coronary artery disease to be documented. Both Nurse Sircy and Dr. Ilia asked Mrs. Cherry about any cardiac history. None was reported.

The nature and quality of Mrs. Cherry's chest pain lacked typical indicators of a cardiac origin. Specifically, it was never described as a tightness, heaviness or pressure, nor was it described as radiating. Dr. Ilia described separate pain locations that were not radiating. He also stated that Mrs. Cherry jumped when he initially placed a stethoscope on her chest, attributing the reaction to Mrs. Cherry's sunburned chest. Patients experiencing a cardiac syndrome event would not be expected to experience hypersensitivity to palpation. Mrs. Cherry's hypersensitivity provided Dr. Ilia with objective evidence supporting the impression of surface-level pain. Dr. Ilia also charted that Mrs. Cherry had had "similar symptoms previously." The fact that Mrs. Cherry had had similar symptoms previously (with no disclosed cardiac history), and did not single out or emphasize chest pain over other localized pain locations (back pain, neck pain, jaw pain) further suggested non-cardiac causes of her symptoms.

Dr. Ilia's evaluation and treatment of Mrs. Cherry was appropriate and complied with the standard of acceptable professional practice. His evaluation included the administration of nitroglycerin. Mrs. Cherry received no pain relief after being administered nitroglycerin. After the initial administration of nitroglycerin, multiple reassuring indicators were present, including objective

3

Case 2:12-cv-00043   Document 225-6   Filed 06/30/14   Page 3 of 10 PageID #: 1920

signs of sunburn, chest pain qualities atypical of cardiac origins, continued normal vital signs, normal monitor readings, normal lab values, Dr. Ilia's impressions upon assessments, and the lack of any specific or diagnostic EKG findings. Therefore, a subsequent repeat administration of nitroglycerin was not required.

Mrs. Cherry was subsequently administered Toradol intravenously after which she noted some degree of pain relief. Toradol is a non-steroidal anti-inflammatory drug with no known effect on ischemic pain. Pain subsidence in response to Toradol, but not nitroglycerin, provided additional data that the patient's chest pain was probably caused by the inflammation of sunburn, and was not cardiac related.

As part of his evaluation, Dr. Ilia also ordered appropriate labs, including CK-MB and troponin levels which detect cardiac enzymes. The CK-MB level of 1.9 was normal. The timing of the troponin level test was appropriate. Blood was drawn for the lab studies at 7:43 pm. Although a nurse's note at 7:16 pm described symptom "onset 2-3 hours ago", Dr. Ilia noted the presence of pain before that, recalling Mrs. Cherry's description of onset while cleaning her car. Mrs. Cherry's family members describe the episode as occurring in the early afternoon, consistent with Ilia's impression. Mrs. Cherry's troponin level of 0.06 was reported as normal within the MCGH Laboratory reference range and was indeed normal. MCGH's reference range for Troponin-I is 0.00 – 0.10. Troponin assays have reference ranges established through individual manufacturers' studies and approved by the FDA.

It was appropriate for Dr. Ilia to conclude that the lab values did not indicate that Mrs. Cherry was suffering from cardiac-related problems. Though a few lab values were outside normal ranges (e.g., albumim serum, potassium, glucose, etc.), these values were inconsequential and were not indicative of

4

cardiac problems. Similarly, Mrs. Cherry's WBC of 14.4 was not specific or concerning.

Dr. Ilia appropriately concluded that Mrs. Cherry's EKG was not specific for any cardiac-related problems. This EKG depicts only nonspecific changes. There is nothing in any singular lead or lead pattern to suggest acute ischemia in a particular area of Mrs. Cherry's heart. There is no appreciable or significant ST depression, nor any definable lateral pattern. While a completely normal EKG would be the exception rather than the rule for most 58 year old patients, there are no acute findings in this EKG specific to the diagnosis of acute coronary syndrome. It was within the recognized standard of acceptable professional practice for Dr. Ilia to conclude that Mrs. Cherry's EKG contained no significant or specific abnormalities, and the recognized standard of acceptable professional practice did not require serial EKGs. Moreover, I disagree with the contention that an EKG can rule out ischemia. An EKG can only rule in ischemia, but not rule it out. The May 30, 2011 EKG does not rule in ischemia.

Dr. Ilia noted his interpretation of the EKG, including his finding of a normal sinus rhythm, and he signed adjacent to the EKG computer read. This is a standard approach and was an appropriate interpretation of a non-diagnostic EKG.

It is not the role of nursing staff to interpret EKGs, and given the presentation and hospital course of Mrs. Cherry, it was not unreasonable for the nursing staff to discharge Mrs. Cherry in keeping with Dr. Ilia's orders and disposition.

I disagree with any claim that the computerized reading of the May 30, 2011 EKG as "abnormal" was conclusive, diagnostic, or indicative of acute coronary syndrome. Computerized EKG readings are subject to a proprietary algorithm implemented by the manufacturer. (In this instance, MCGH used a

5

GE MAC 1200 EKG.) The EKG's automated interpretation is typically dependent upon the manufacturer's choice of algorithm, and the automated interpretation does not represent the recognized standard of acceptable professional practice. The resultant readings are rarely considered conclusive and the algorithms are extremely sensitive and often result in over-interpretation. Of note, the computer read of this EKG makes no reference to any ST depressions. As a result, it is certainly within the recognized standard of acceptable professional practice for emergency medicine physicians not to accept automated interpretations as definitive or accurate.

I also disagree that the May 30, 2011 EKG contained motion artifact requiring repetition of the EKG. Most EKGs will inevitably have some motion artifact. If the May 30, 2011 EKG contains any motion artifact, it was certainly not severe enough to prevent an accurate reading and interpretation. The recognized standard of acceptable professional practice did not require serial EKGs, nor was Dr. Ilia required to obtain prior EKG's for comparison.

I disagree with the claim that the patient was not monitored from 21:12 to 21:50. Emergency room charts customarily and appropriately contain excerpts from heart monitor strips rather than the entirety of the strip, primarily because of record volume concerns. Heart monitor machines are generally calibrated to print upon any significant detected abnormality. The excerpts appearing in Mrs. Cherry's MCGH chart are typical and depict no rhythm abnormalities.

MCGH employed a "Fail-Safe Checklist" which Nurse Sircy described as a "reference." The checklist does not distinguish between high and low risk patients. It is not uncommon for a hospital to have such checklists, though they do not establish the standard of care. This particular list wasn't designed to provide a calculus or scoring system for determining course of action. Nevertheless, Mrs. Cherry's presentation would have resulted in a significant majority of negative findings under the checklist. There are no standardized

6

checklist scores that are uniformly accepted in the practice of emergency medicine or that establish the standard of care. Nevertheless, there are risk assessments and stratifications that provide numeric risk calculations based upon a variety of findings. For example, under the Thrombolysis In Myocardial Infarction ("TIMI") risk score analysis, Mrs. Cherry's presentation would have resulted in a percentage risk of less than 5% at 14 days of all-cause mortality, new or recurrent myocardial infarction, or severe recurrent ischemia requiring urgent revascularization. An even lesser percentage would apply within 24 hours. Under the TIMI risk score, Mrs. Cherry was in the lowest risk category and emergency room discharge would be reasonable.

Based upon Mrs. Cherry's clinical presentation, clinical evolution, lab results, monitor readings, EKG results, reactions to medication, it was within the standard of care for Dr. Ilia to have concluded that Mrs. Cherry's pain was of sunburn and musculoskeletal etiology. Furthermore, it was within the standard of care for Dr. Ilia to conclude that Mrs. Cherry was not experiencing acute coronary artery syndrome requiring admission to MCGH or transfer to another medical facility. The decision to discharge was appropriate, and given Dr. Ilia's evaluation and disposition, and Mrs. Cherry's hospital course, it was not unreasonable for the MCGH nursing staff to follow Dr. Ilia's discharge plan. Also, having generic discharge instructions for commonly encountered problems is reasonable. Ultimately, the physician is responsible for deciding on a discharge plan and communicating it to the patient. Nurses are often helpful in answering questions which arise and are often confronted with diagnoses which fall into no clear category applicable to the available discharge material.

Additionally, the MCGH nursing staff did not deviate from the recognized standard of acceptable professional practice by not utilizing the "chest pain" template. The recognized standard of acceptable professional

7

practice, in a complex case as this one, does not require the nursing staff to choose one template over another. Templates and protocols are a matter of institutional and/or individual choice, chosen for a variety of reasons, some clinical, some not, and it is inappropriate to equate them with the recognized standard of acceptable professional practice, although they may overlap at times.

The instructions provided to Mrs. Cherry at discharge – to follow up with her primary care physician, to return to the emergency department as needed, to fill the prescriptions given to her and to take as directed – were appropriate and adequate. Dr. Ilia stated that he typically advises follow-up with a primary care physician within 1-2 days. Under the circumstances, the distance from MCGH to Mrs. Cherry's actual residence in Indianapolis, IN was of no consequence. She clearly had access to MCGH at the time, and there was no apparent suggestion by Mrs. Cherry that follow-up within 1-2 days was unfeasible. There was no obligation on the part of Dr. Ilia or the MCGH nursing staff to consider the distance from the emergency department to Mrs. Cherry's residence in their discharge planning.

I disagree with the claim that Dr. Ilia "admitted that Mrs. Cherry received no treatment for sunburn in the emergency department." As I read Dr. Ilia's deposition, he stated that among the medications he prescribed, Voltaren was prescribed in part for her "burn pain." He stated that, for sunburn patients, "usually you give them pain medicine." He agreed that Silvadene is used for sunburn, but only for second degree sunburn. He also agreed that calamine lotion can be applied to sunburn, but he doesn't provide this over-the-counter ointment; instead patients are asked to apply it. ("…we ask them to put calamine lotion on it.")

Aspirin is not prescribed for sunburn, which Dr. Ilia had already treated. More importantly, given the mechanism of Mrs. Cherry's subsequent

8

acute proximal occlusion with thrombus in the right coronary artery, aspirin would probably not have made a difference in outcome.

There is conflicting testimony between family members and documentation by the Celina Fire Department EMS crew that attended to Mrs. Cherry on the morning of May 31, 2011. Family members state that they administered resuscitative measures, and that the EMT crew provided no resuscitative measures or that they did so inadequately and failed to document accurately. Regardless, the timely administration of resuscitative measures was vital to Mrs. Cherry. Its absence results in anoxic brain damage within minutes. EMT records describe Mrs. Cherry as unresponsive, in asystole, with dilated pupils. If provided with the transcripts of the EMT crew member depositions, I can offer opinions regarding their care and treatment and the effect upon Mrs. Cherry's outcome.

Following Mrs. Cherry's collapse, she was unconscious and was subsequently sedated and intubated. She never regained consciousness. As a result, there is no evidence to support the assertion that Mrs. Cherry experienced any mental or physical suffering prior her death.

Within a reasonable degree of medical certainty, nothing Dr. Ilia did or failed to do caused or contributed to any of Plaintiff's alleged injuries, including Mrs. Cherry's death. Likewise, nothing MCGH's nurses or staff did or failed to do caused or contributed to any of Plaintiff's alleged injuries, including Mrs. Cherry's death.

As a smoker who was also non-compliant with prescription medications – including specifically a statin medication that reduces the risk and mortality rate of heart attack – Mrs. Cherry did not have a normal life expectancy. Moreover, the May 31, 2011 MCGH medical records recite a prior medical history of chronic obstructive pulmonary disease, pulmonary

hypertension, and hypertension. If accurate, these conditions would have reduced Mrs. Cherry's life expectancy even more substantially.

I have provided a separate document listing all cases from the previous four years in which I have testified as an expert at trial or by deposition. My fee schedule is as follows:

Initial case acceptance and review fee:     $1500.00

Standard hourly rate: $400.00/hour
• Case or deposition review, phone calls or meetings, research used in deposition or preparation of written reports, preparation for deposition or trial

Depositions: $750.00/hour, $2250.00 per day minimum
• $2250.00 for each day reserved for scheduled deposition ($2250 represents minimum fee for each scheduled deposition). If deposition date is changed or cancelled within 30 days of scheduled date, this full fee will be charged as a cancellation fee (unless Jones initiates change).
• Add $750/hour for each hour after 3 hours of deposition.

Trial: $1500.00/hour, $3000.00 per day minimum
• $3000.00 for each day reserved for trial. If trial date is changed or cancelled within 60 days of scheduled date, this full fee will be charged as a cancellation fee (unless Jones initiates change) as will non-refundable T&E.
• $1500/hour for courtroom testimony in addition to $3000.00 for each day reserved for trial.

Travel: T&E plus $100 per hour with cap
• T&E: Transportation, hotel and meals reimbursed with receipts.
• $100/hour door-to-door, maximum $1200/day, in addition to T&E.

Yours truly,

Alan E. Jones, M.D.

10