UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| DAVID CHERRY, personal representative of the ESTATE OF PAMELA CHERRY, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 2:12-cv-00043 |
| v. | ) ) ) | Judge Aleta A. Trauger |
| MACON HOSPITAL, INC. d/b/a MACON COUNTY GENERAL HOSPITAL; HANNA C. ILIA, M.D.; JAMES BARLOW; JIMMY PHILPOTT, CELINA FIRE DEPARTMENT EMS; and CLAY COUNTY E911 BOARD, | ) ) ) ) ) ) ) | |
| Defendants, | ) | |

## MEMORANDUM

Pending before the court are four dispositive motions. Defendant Celina Fire Department EMS (the "Town") has filed a Motion to Dismiss under Rule 12(b)(6) (Docket No. 154) and a Motion for Summary Judgment under Rule 56 (Docket No. 189). Defendant Clay County E911 Board (the "911 Board") has filed a Motion to Dismiss under Rule 12(b)(6) (Docket No. 167) and a Motion for Summary Judgment under Rule 56 (Docket No. 169). For the reasons explained herein, the Town's Motion to Dismiss will be denied as moot, the Town's Motion for Summary Judgment will be granted, the 911 Board's Motion for Summary Judgment will be granted, the 911 Board's Motion to Dismiss will be denied as moot, and both the Town and the 911 Board will be dismissed from the case with prejudice.

## BACKGROUND

### I. Factual Background

This case concerns the unfortunate death of Pamela Cherry, an Indiana resident. In May 2011, Ms. Cherry and her husband, David Cherry, stayed with Mr. Cherry's parents in Tennessee during a vacation trip. On May 30, 2011, Ms. Cherry went to the Macon County General Hospital (the "Hospital") complaining of chest and jaw pain. Dr. Ilia examined Ms. Cherry, performed blood and EKG tests on her, and sent her home later that night with a diagnosis of chest pain and a sunburn. Around 6 a.m. the next morning, while staying at her in-laws' house, Ms. Cherry got up to make coffee, suffered a sudden cardiac arrest, and collapsed in the kitchen. She was alone when this happened.

About five minutes later, her daughter's boyfriend, who was sleeping in the next room, woke up, realized something was wrong, and contacted Mr. Cherry.[1] Mr. Cherry came into the kitchen, saw his wife unconscious and not breathing, and directed his mother, Georgia Cherry, to call 911. Georgia called 911 at 6:10 a.m. The dispatcher, Richard Upton, called an ambulance service at 6:10 a.m. (just after receiving the call), and the ambulance left the station at 6:13 a.m. Unfortunately, the Cherry residence was located approximately 18-20 miles from the Celina ambulance station (to the east) and approximately 18-20 miles from the Hospital (to the West).

At 6:21 a.m., Georgia Cherry called 911 again to report that the ambulance had not yet arrived, that Ms. Cherry was "not responding," and that it "seems to me like she went dead . . . ." At some point before or during that call, Mr. Cherry attempted to perform CPR on his wife. At any rate, during the call, Mr. Cherry got on the line with the dispatcher and told him, "I don't know what to do" with respect to CPR, in which Mr. Cherry had not been trained. The

---

[1] Ms. Cherry's daughter's boyfriend initially woke up when he heard a sound in the kitchen but thought something had simply fallen in the kitchen. About five minutes later, he woke up again, went into the kitchen, and saw Ms. Cherry on the kitchen floor, at which point he contacted Mr. Cherry.

dispatcher attempted to guide Mr. Cherry through the CPR process. After traversing approximately 20 miles to the Cherry residence, the ambulance arrived at 6:32 a.m., which was approximately 22 minutes after the initial call and at 27 minutes from the time that Ms. Cherry had suffered cardiac arrest and collapsed. At 6:21 a.m. or some time before, Tammy Richmond, a neighbor who was a nurse, arrived and attempted to perform CPR on Ms. Cherry. Emergency Medical Technician James Barlow and Paramedic Jimmy Philpott entered the house around 6:32 a.m.[2]

There is a factual dispute as to what happened shortly before medical personnel arrived. According to Ms. Richmond, she and Mr. Cherry were able to restore Ms. Cherry's pulse by the time the EMTs arrived, although Barlow and Philpott reported that she had no pulse when they arrived. At any rate, by the time Barlow and Philpott arrived, Ms. Cherry's pupils were fixed and dilated. After Barlow and Philpott detected a pulse (or, according to them, restored one) they loaded Ms. Cherry onto the ambulance for transport.

The ambulance transported Ms. Cherry to the Hospital, from which she was airlifted to Vanderbilt University Medical Center. At the Medical Center, it was determined that Ms. Cherry's right coronary artery was 100% occluded. She had no brain function, life support was discontinued, and she expired within five minutes.

## II. Procedural History

### A. Procedural History Preceding the Motions Now Before the Court

The complicated procedural history of this case is relevant to the pending motions. On May 23, 2012, Mr. Cherry (as a representative of his wife's estate) sued Dr. Ilia and the Hospital for medical malpractice. (Docket No. 1.) In compliance with the Tennessee Medical

---

[2] For purposes of simplicity, the court will refer to Barlow and Philpott as "the EMTs."

Malpractice Act ("TMMA"), Mr. Cherry filed a Certificate of Good Faith with his Complaint, which averred that one or more qualified medical experts had provided signed written statements indicating that there was a good faith basis to bring medical malpractice claims against Dr. Ilia and the Hospital. (*Id.*, Ex. C.)

Towards the close of the fact discovery period, testimony from certain witnesses suggested that (1) the 911 dispatchers may have acted negligently in handling the calls from the Cherry residence, and (2) Barlow and Philpott (acting under the authority of the Town of Celina's Fire Department) may have acted negligently in treating Ms. Cherry upon arrival at the Cherry residence. With leave of court, the defendants filed Amended Answers on August 8, 2013, asserting that the 911 Board (purportedly as the dispatchers' employer), Barlow, Philpott, and the Town were comparatively at fault.[3] In compliance with Tennessee health care liability law, Dr. Ilia and the Hospital filed Certificates of Good Faith within 30 days of amending their answers, averring that one or more medical experts had stated that there was a reasonable basis to allege that these four entities were comparatively at fault for Ms. Cherry's injuries. (Docket Nos. 104 (Dr. Ilia) and 105 (the Hospital).) As Dr. Ilia and the Hospital later represented to the court, their respective Certificates of Good Faith, which asserted the EMTs' and the Town's comparative fault, were premised on the initial deposition testimony of EMT Barlow (taken on June 25, 2013) and his confirmation of entries in the EMT record. (*See* Docket No. 205.)

In response, Mr. Cherry filed an Amended Complaint on October 31, 2013, which added claims against the 911 Board, Barlow, Philpott, and the Town. (Docket No. 133.) Without

---

[3] The parties appear to agree that Barlow and Philpott were acting on behalf of the Celina Fire Department EMS, and that claims against Celina's fire department are effectively claims against the Town of Celina. The court accordingly will refer to claims against "the Town."

4

opposition, the court dismissed Barlow and Philpott on the grounds of absolute personal immunity. (*See* Docket No. 156 (motion) and 184 (order).)

**B. The Town's Rule 12 and Rule 56 Motions**

On December 20, 2013, the Town filed a Motion to Dismiss (Docket No. 154), contending that the claims against it should be dismissed because Mr. Cherry's Amended Complaint did not include a certificate of good faith supporting his claims against the Town. (Docket No. 154.)[4] Mr. Cherry filed a Response in opposition (Docket No. 173), Dr. Ilia filed a Response (Docket No. 185) (stating that he neither opposes nor joins the motion), and the Town filed a Reply (Docket No. 193).

On January 25, 2014, the Town also filed a Motion for Summary Judgment (Docket No. 189), contending that the claims against it should be dismissed because it was undisputed that Ms. Cherry had less than a 50% chance of survival when Barlow and Philpott arrived at the Cherry residence. (Docket No. 189.) Mr. Cherry filed a Response, stating as follows:

> Plaintiff cannot present any expert opinion creating a genuine issue of material fact as to whether Pamela Cherry possessed a greater than fifty percent chance of survival after discharge[] from the Macon General Hospital by Defendant Hanna C. Ilia, M.D. Indeed, as Plaintiff's expert Joseph L. Fredi, M.D., FACC, FACP has opined before the Town of Celina was added to this case, Mrs. Cherry's prospects of survival ranged between four and ten percent after her out-of-hospital arrest. This seems incompatible with the Tennessee Supreme Court's holding in *Kilpatrick v. Bryant*, 868 S.W.2d 594 (Tenn. 1993) that "there can be no liability in a medical malpractice case for negligent diagnosis or treatment that decreases a patient's chances of avoiding death or other adverse medical condition where the death or adverse medical condition would probably have occurred anyway."

(Docket No. 204 at pp. 1-2.) However, under Fed. R. Civ. P. 56(d), Dr. Ilia and the Hospital requested the opportunity to re-depose Barlow to probe the retractions stated in his affidavit,

---

[4] Before their dismissal on grounds of personal immunity, Barlow and Philpott had joined this motion.

5

which they represented would "be crucial to determining whether the EMTs in fact delayed resuscitative measures, the extent of such delay, and whether it played a causative role in Ms. Cherry's demise." (Docket No. 205 at p. 4.) Dr. Ilia and the Hospital represented that "[s]uch clarification will impact *defense expert opinion* and likely determine the appropriate outcome of Celina's present motion." (*Id.*) (emphasis added).

The court granted the requested relief (Docket No. 211), and the parties entered an Agreed Order allowing limited discovery related only to the question of the timeliness of resuscitative measures during the emergency response involving Ms. Cherry. (Docket Nos. 212-215; *see also* Docket No. 222.) On June 30, 2014, Dr. Ilia filed a Response in opposition to the Town's motion. (Docket No. 225.) The Town filed a Reply. (Docket No. 227.)

**C. The 911 Board's Rule 12 and Rule 56 Motions**

In close succession, the 911 Board also moved for dismissal under Rule 12 and moved for summary judgment under Rule 56.

On December 23, 2013, the 911 Board filed a Motion to Dismiss (Docket No. 167), contending that dismissal is warranted because (1) Mr. Cherry had not filed a Certificate of Good Faith in support of his claims against the 911 Board, and (2) the 911 Board was entitled to sovereign immunity because Tenn. Code Ann. § 29-20-108 insulates the 911 Board from vicarious liability for the actions of dispatchers within its employ. Mr. Cherry filed a Response in opposition as to both arguments (Docket No. 186), while the Hospital (Docket No. 184) and Dr. Ilia (Docket No. 187) both filed Responses in which they (a) agreed with Mr. Cherry that § 108 did not preclude vicarious liability claims against the Hospital for the negligent acts of its employees, and (b) took no position as to whether Mr. Cherry should have filed a certificate of good faith relative to the 911 Board. The 911 Board filed a Reply. (Docket No. 201.)

On January 3, 2014, the 911 Board also filed a Motion for Summary Judgment (Docket No. 169), in support of which it filed a Statement of Undisputed Material Facts (Docket No. 170), a supporting affidavit of Beth Moulton (Docket No. 170, Attachment No. 1), Director of the 911 Board, and a Memorandum of Law (Docket No. 171). In substance, the 911 Board asserted that the two dispatchers on duty on May 31, 2011 were not employees of the 911 Board at the time; instead, one was an employee of Clay County, while the other was an employee of the City of Celina.[5]

In response to the 911 Board's motion, Mr. Cherry represented that he "knows of no material issues of fact and is not in possession of facts or knowledge that would contradict the affidavit of Beth Moulton." (Docket No. 195.) Dr. Ilia and the Hospital did not give up so easily: they moved for deferred consideration of the 911 Board's motion and for discovery under Rule 56(d) to probe whether the dispatchers could be considered "employees" of the 911 Board. (Docket Nos. 196 and 198.)[6] On February 5, 2014, the court granted the motions, allowed the requested discovery (subject to agreement between the parties as to its scope), and deferred consideration of the 911 Board's Rule 12 and Rule 56 motions. (Docket No. 203.) On February 24, 2014, the court entered an Agreed Order (Docket No. 210), which allowed limited discovery

---

[5] Ms. Moulton may have meant the Town of Celina, rather than the "City" of Celina. At any rate, the operative point is that the dispatcher was not an employee of the 911 Board at the time.

[6] *See* Docket No. 196, Ex. 1, Rule 56(d) Affidavit of Michael F. Jameson, ¶¶ 5 (seeking to ascertain facts regarding "who and what entity is responsible for hiring, training, supervising, firing and evaluating the personnel who operate E911 (regardless of whether the personnel are paid by Clay County, Tennessee or the City of Celina), as well as payroll and financial arrangements between Clay County and other relevant governmental entities) and 6 (stating that Clay County and Ms. Moulton "possess the entirety of the information, documents, and other evidence needed to evaluate *whether an employment relationship existed* between them") (emphasis added).

7

related to the issue of governmental immunity. Specifically, Dr. Ilia and the Hospital agreed to request within thirty days records they believed "may have [a] bearing on the issue of whether the dispatchers on duty on May 31, 2011 were employees of [the 911 Board] for purposes of the Governmental Tort Liability Act," and the 911 Board reciprocally promised to produce those records within thirty days of their request. The parties also agreed that any depositions would be completed within 90 days of the order, that within 15 days after the close of this discovery, Dr. Ilia and the Hospital would file supplemental responses relating to the 911 Board's immunity, and the 911 Board would have 10 days to respond to any supplemental brief(s).

Doing the math, at the latest, the parties would have completed this discovery by May 25, 2014, giving Dr. Ilia and the Hospital until June 9, 2014 to file briefs relating to whether there was a genuine dispute of material fact concerning the employment status of the two dispatchers at issue on May 31, 2011. Neither the Hospital nor Dr. Ilia filed a supplemental brief on or after that deadline. On June 11, 2014, following a mediation among the parties, the court entered an agreed Order of Dismissal of Mr. Cherry's claims against the Hospital. (Docket No. 223.)

In sum, as it stands now, Mr. Cherry has formally stated that he is unable to present facts disputing those set forth in the Moulton Affidavit, and (following the requested discovery) no other party filed a brief or facts in opposition to the 911 Board's Rule 56 motion, the 911 Board's Rule 56.01 Statement of Material Facts (Docket No. 190), or the facts stated in the supporting Moulton Affidavit. Therefore, the 911 Board's Rule 56 motion is effectively unopposed, the facts stated in the Moulton Affidavit are undisputed, and the court assumes that the facts stated in the 911 Board's Rule 56.01 are true. *See* Local Rule 56.01(g) ("Failure to respond to a moving party's statement of material facts, or a non-moving party's statement of

additional facts, within the time periods provided by these Rules shall indicate that the asserted facts are not disputed for purposes of summary judgment").

## ANALYSIS

### I. The 911 Board's Motions

Although the 911 Board's Rule 56 motion is unopposed, a brief discussion of the immunity issue is warranted. The Tennessee Governmental Tort Liability Act ("TGTLA"), Tenn. Code Ann. § 29-20-201(a) codifies Tennessee's common law rules concerning sovereign immunity and states exceptions to the general grant of immunity from suit. *See Limbaugh v. Coffee Med. Ctr.*, 59 S.W.3d 73, 79 (Tenn. 2001). Under the statute, the default rule is that, except as otherwise provided within the TGTLA, "[a]ll governmental entities shall be immune from suit for any injury which may result from the activities of such governmental entities wherein such governmental entities are engaged in the exercise and discharge of their functions, governmental or proprietary." Tenn. Code Ann. § 29-20-201(a). The TGTLA contains specific provisions that waive sovereign immunity for identified types of claims, including (1) certain claims stemming from the negligent operation of motor vehicles by government employees acting within the scope of their employment (§ 202), (2) injuries caused by defective, unsafe, or dangerous conditions on highways, streets, and sidewalks (§ 203), (3) injuries caused by certain "dangerous structures" under specified circumstances (§ 204), and (4) certain injuries stemming from the "negligent acts or omissions of public "employees" acting within the scope of their employment (§ 205). Only the last of these limited waivers of sovereign immunity is relevant here.

In addition to the default immunity provision (§ 201(a)) and the general provision removing that immunity when the negligent acts of a governmental entity's employee causes

9

injury (§ 205), the TGTLA also contains a special provision specific to emergency communications district boards (§ 108). Section 108 states as follows:

> a. Emergency communications district boards, established in § 7-86-105, and the members of such board shall be immune from any claim, complaint or suit of any nature which relates to or arises from the conduct of the affairs of the board except in cases of gross negligence by such board or its members. The finding of the general assembly is that the service of such boards and the members thereof is so critical to the safety and welfare of the citizens of this state that such absolute and complete immunity is required for the free exercise of the duties of such boards by the members.
>
> b. Such immunity shall not, however, be construed to extend to any employee of the emergency communications district.

Here, with respect to the 911 Board's Rule 12 motion, the parties debate whether § 108 preserves or abrogates the general removal of sovereign immunity set forth in § 205. Dr. Ilia and Mr. Cherry argue that the "affairs of the board" referenced in § 108(a) do not include the actions of employee dispatchers and that § 108(b) accordingly should be read to mean that the board (like other governmental entities under § 205) is vicariously liable for the negligent actions of its employees. By contrast, the 911 Board argues that § 108(a) protects emergency communications districts from vicarious liability for the acts of their employees (among other things), and that § 108(b) simply permits claims to proceed against those employees directly instead of against the board. The parties agree that this issue of statutory construction presents an issue of first impression.

This court need not reach the statutory construction issue, because, under any construction of § 108 and § 205, the TGTLA only removes immunity for *employees* of an emergency communications district or a government entity generally. Under the TGTLA, a person is only considered an employee for purposes of removal of immunity if a court

"specifically finds that all [five] of the [] elements exist." Tenn. Code Ann. § 29-20-107(a) (emphasis added). The elements are as follows:

> (1) The government entity itself selected and engaged the person in question to perform services;
>
> (2) The government entity itself is liable for the payment of compensation for the performance of such services and the person receives all of such person's compensation directly from the payroll department of the governmental entity in question;
>
> (3) The person receives the same benefits as all other employees of the governmental entity in question including retirement benefits and the eligibility to participate in insurance programs;
>
> (4) The person acts under the control and direction of the governmental entity not only as to the result to be accomplished but as to the means and details by which the result is accomplished; and
>
> (5) The person is entitled to the same job protection system and rules, such as civil service or grievance procedures, as are other persons employed by the governmental entity in question.

Tenn. Code Ann. § 29-20-107(a). Tennessee requires "strict compliance" with each of these terms for purposes of removal of sovereign immunity under the TGTLA. *Baker v. Snedegar*, 2013 WL 5568424, at *5 (Tenn. Ct. App. Oct. 8, 2013).

Here, it is undisputed that the 911 Board was not the dispatchers' "employer" under the TGTLA (§ 107(a)) for multiple independent reasons: the 911 Board did not engage the dispatchers, did not pay their compensation or benefits, and did not direct their activities. Because the TGTLA does not remove the 911 Board's immunity for the actions of dispatchers who were not its employees under any circumstances, the 911 Board is, without opposition, entitled to summary judgment and will be dismissed from the case.[7] Because the 911 Board is

---

[7] The court notes that the Tennessee General Assembly recently passed an amendment to TGTLA § 108, which will become effective January 1, 2015. *See* 2013 TN S.B. 2407, Sections

unquestionably entitled to summary judgment on this basis, the court need not address the more nuanced question of statutory interpretation presented in the 911 Board's Rule 12 motion as it relates to the TGTLA.[8]

## II. The Town's Motions

In its Rule 12 motion, the Town argues that Mr. Cherry's claims against it should be dismissed because Mr. Cherry did not file a Certificate of Good Faith when he added the Town to the case after the Hospital and Dr. Ilia (supported by their own Certificate of Good Faith) had asserted the comparative fault of the 911 Board in their respective Amended Answers. In its Rule 56 motion, the Town contends that there is insufficient evidence in the record to hold it liable at trial. The Town's Rule 12 motion raises a difficult issue of Tennessee law concerning the appropriate application of the "certificate of good faith" requirement set forth in the Tennessee Health Care Liability Act, Tenn. Code Ann. 29-26-101 *et seq*.[9] Because the Town is clearly entitled to summary judgment on the merits under Rule 56, the court will simply assume

---

9 and 15 (Jan. 30, 2014), 2014 Tenn. Laws Pub. Ch. 795 Sections 9 and 15 (H.B. 2255), eff. Jan. 1, 2015. Section § 108(b) will be amended to read as follows: "Such immunity shall also extend to employees of an emergency communications district, and county and municipal governments for the acts or omissions of employees that manage, supervise, or perform 911 emergency communications service as communicators or dispatchers, provided that all such employees shall attain and maintain training requirements as may be required by law."

[8] For the same reasons, the court need not address whether Mr. Cherry was required to file a Certificate of Good Faith when he added claims against the 911 Board after the Hospital and Dr. Ilia (supported by their own Certificates of Good Faith) had asserted the comparative fault of the 911 Board in their respective Amended Answers.

[9] At times, parties here and in other cases continue to refer the law as the "Tennessee Medical Malpractice Act." Following legislative amendments to the law in 2012, the law is known as the "Tennessee Health Care Liability Act." *See Barnett v. Tenn. Orthopedic Alliance*, 391 S.W.3d 74 (Tenn. Ct. App. 2012).

*arguendo* that Mr. Cherry was not required to file a certificate of good faith when he amended his complaint to add the Town as a party.[10]

The plaintiff in a medical malpractice action has the burden of proving by expert testimony the following three elements:

> (1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;
>
> (2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and
>
> (3) As a proximate result of the defendant's alleged act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

Tenn. Code Ann. § 29-26-115(a). A plaintiff must prove all of these elements through competent expert testimony from a licensed health care professional. *Kelley v. Middle Tenn. Emergency Physicians, P.C.*, 236 S.W.3d 708 (Tenn. Ct. App. 2007) (citing Tenn. Code Ann. § 29-26-115(b)).

With respect to the third element, which requires a causal connection between the defendant's act or omission and the plaintiff's injuries, a plaintiff must establish that it is "more

---

[10] In *Portwood v. Montgomery Cnty., Tenn*, 2013 WL 6179188 (M.D. Tenn. Nov. 25, 2013), a defendant in a health care liability case asserted the comparative fault of a non-party in its affirmative defenses but failed to file a supporting certificate of good faith within 30 days, as required by Tenn. Code Ann. § 122. This court (1) struck the affirmative defense under Rule 12(c), and (2) dismissed the plaintiff's claim against that non-party on the grounds that the plaintiff, who had added that entity only after the defendant had asserted the comparative fault of that entity, had not filed a certificate of good faith with the amended complaint. Here, the plaintiffs argue that *Banks v. Elks Club Pride of Tenn. 1102*, 301 S.W.3d 215, 225 n.15 (Tenn. 2010) compels a different conclusion on this second point. In light of the court's rulings concerning the Town's Rule 56 motion, the court need not revisit its reasoning in *Portwood* at this time.

13

likely than not that the defendant's negligence caused plaintiff to suffer injuries which would not otherwise have occurred." *Kelley*, 236 S.W.3d at 712. Thus, "[t]he plaintiff must have had a better than even chance of surviving or recovering from the underlying condition absent the [medical professional's] negligence." *Kilpatrick v. Bryant*, 868 S.W.2d 594, 602 (1993) ("[T]he plaintiff may not recover damages for the loss of a less than even chance of obtaining a more favorable medical result. The traditional test for cause in fact prevents recovery because the patient's condition would more likely than not be the same even if the defendant had not been negligent.") Therefore, the question presented in this wrongful death action is whether there is competent expert evidence from which a jury could conclude that the EMTs' alleged negligence more likely than not caused Ms. Cherry's death. In other words, to assert this type of "loss of chance" claim, the court must determine whether there is expert evidence that Ms. Cherry had a 50% or better chance of survival by the time the EMTs arrived.

The Town's retained expert, Sullivan K. Smith, M.D., avers that, based on his review of the record: (1) Ms. Cherry had only a 30% chance of survival *immediately after collapsing*, and even then only with Advanced Life Support from a paramedic provided under the most optimal conditions;[11] (2) Ms. Cherry's chances of survival decreased "drastically" during the five-plus minute delay between her collapse and the time anyone came to her aid; and (3) any additional delay in performing meaningful CPR after that time (or any CPR) "further drastically reduced" her chance of survival, such that her chances of survival were "negligible, at least less than 5%,

---

[11] He avers that, "[b]ased upon studies, if a patient has an out-of-hospital cardiac arrest, the best statistical chance of recovery is in the 30% range and only when advanced life support is provided in optimal conditions. In this case there is no evidence that an AED [a defibrillator] was available or used and, as stated, based upon the testimony and based upon the narrative of the 911 calls, it is very questionable that even meaningful CPR was performed prior to the arrival of Paramedic James Barlow and Emergency Medical Technician Jimmy Philpott."

by the time the ambulance arrived at the home." (Docket No. 189, Ex. 10.) Accordingly, in Dr. Smith's opinion, "by the time the ambulance arrived at the home, there was substantially no chance of survivability at all." (*Id.*) Thus, "[e]ven though they were able to restore a pulse, Pamela Cherry's chance of survival was essentially nil." (*Id.*)

As Mr. Cherry admits, his own retained expert, Dr. Fredi, believes that Ms. Cherry had only a 4% to 10% chance of survival at the time she suffered the out-of-hospital cardiac arrest.

Dr. Ilia's response largely focuses on (a) asserting factual disputes about whether (and when) Mr. Cherry or Ms. Richmond may have begun administering CPR to Ms. Cherry (*i.e.*, before the EMTs arrived), and (b) whether testimony from a *plaintiff's* expert, Dr. Richard M. Sobel, M.D., establishes that there is a genuine dispute of material fact concerning Ms. Cherry's chances of survival when the EMTs arrived. Dr. Ilia's response contains three glaring omissions: (1) he does not present any evidence from his own medical expert (Dr. Alan Jones) that Ms. Cherry had a chance of survival of at least 50% when the EMTs arrived; (2) he does not identify any other expert testimony specifically stating that Ms. Cherry had a chance of survival of at least 50% when the EMTs arrived; and (3) his brief does not even reference the relevant Tennessee standard, let alone argue that he can present expert testimony that meets it. The absence of defense expert testimony on this point is particularly significant, given that Dr. Ilia specifically requested additional discovery of Barlow under Rule 56(d) and believed that it would "impact defense expert opinion" in the case.

With respect to Dr. Sobel's testimony, Dr. Sobel did not testify that Ms. Cherry had a greater than 50% chance of survival. In the referenced testimony from Dr. Sobel's deposition, Dr. Sobel was asked to comment on Dr. Jones's report (Dr. Ilia's retained expert), who had maintained that "[a] timely administration of resuscitative measures was vital to Ms. Cherry."

15

Whatever that opinion meant, Dr. Sobel did not adopt it and characterized it as "very speculative."

As to the factual disputes advanced by Dr. Ilia, they are immaterial. The expert testimony in the record establishes that, even if Ms. Cherry had been administered advanced life support measures by a qualified medical professional *immediately* after collapsing, she had at most a 30% chance of survival. Thus, even assuming optimal conditions that were not present here, the Tennessee standard cannot be satisfied (relative to the Town) because Ms. Cherry had less than a 50% chance of survival at the time she collapsed. The expert evidence also establishes that Ms. Cherry's prospects of survival decreased even further during the period of time between her collapse and the time she was administered meaningful resuscitative measures, which took at least five minutes and (almost certainly) much longer than that. In other words, by the time the EMTs arrived, Ms. Cherry had substantially less than a 50% chance of survival. Dr. Ilia has not presented expert evidence from which a jury reasonably could conclude otherwise. Indeed, if Dr. Ilia could present expert evidence to that effect, one would have expected Dr. Ilia to file an affidavit from his retained expert (or, perhaps, himself) expressing that opinion.

In sum, both the 911 Board and the Town are entitled to summary judgment and will be dismissed from the case.

## **CONCLUSION**

For the reasons stated herein, the 911 Board's Motion for Summary Judgment and the Town's Motion for Summary Judgment will be granted, the 911 Board's Motion to Dismiss and the Town's Motion to Dismiss will be denied as moot, and all claims against the 911 Board and the Town will be dismissed with prejudice.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge